ANDREW H. SAUER, Respondent, v CENTURY FEDERAL SAVINGS & LOAN ASSOCIATION OF LONG ISLAND (Successor in Interest to LAWRENCE CEDARHURST FEDERAL SAVINGS), Appellant, et al., Defendants.

Second Department, July 16, 1979

## APPEARANCES OF COUNSEL

*Blum, Ross, Weisler, Bergstein & Golden (Samuel H. Golden and Charles W. Weiss of counsel), for appellant.*

*Jessel Rothman, P. C. for respondent.*

## OPINION OF THE COURT

SHAPIRO, J.

In this action, *inter alia,* to recover pension benefits and vacation pay, defendant Century Federal Savings & Loan Association of Long Island (Century) appeals from a judgment of the Supreme Court, Nassau County, which, after a nonjury trial, directed it to pay plaintiff the sum of $3,725.59, representing his pension benefits, and $269.23, representing apportionment of vacation pay. There should be a reversal and a new trial.

### PRELIMINARY STATEMENT

On April 17, 1975 plaintiff, a 14-year employee of Century, and who was then the manager of the Rockaway Park branch, was confronted by the president and vice-president of Century with accusations of dishonesty as to three sets of transactions. He thereupon resigned. Later that day his attempt to withdraw his resignation was rejected.

Century maintained a pension plan (the plan) which was funded solely by its own contributions. The plan was administered by the individual defendants as trustees. Century concedes that but for plaintiff's alleged dishonest acts he would have been entitled to a lump-sum pension payment of $3,725.59, but claims that he forfeited his rights thereto because of his dishonesty.

Paragraph 7.04 of the plan provides: "If such termination of employment shall be due to the Participant's dishonesty or through any willful act in the course of his employment, to the injury of the Employer or his fellow Employees, he shall forfeit any and all interest in the Policy on his life. The decision of the Board of Directors of the Employer that such termination is for a cause herein described shall be final and binding and conclusive."

In addition to his pension claim, plaintiff also sought to recover three weeks vacation pay at the rate of $307.69 per week.

### THE TRIAL TERM DECISION

The trial court held that plaintiff was deprived of his vested pension benefits by means of an unauthorized procedure, to wit, that "[t]wo officers of Century made a determination that plaintiff was terminated due to dishonesty", although "[p]aragraph 7.04 of the agreement provides that such determinations are to be made by the Board of Directors of Century. Despite the conduct of the plaintiff (which the Court finds was questionable at best), Century could not effectively take away his pension right unless it did so in accordance with the Plan. Because it failed to do so, plaintiff is granted a judgment on the first cause of action in the amount of $3,725.59, plus interest from April 17, 1975".

As to the cause of action for vacation pay the court stated: "the evidence adduced, sparse as it may be, demonstrated the existence of a policy whereby employees such as plaintiff received three weeks vacation per year, but did not establish that the right thereto vested immediately on January 1 of each year. Inasmuch as vacation pay is considered a portion of an employee's compensation (see *People v Vetri,* 309 N.Y. 401, 407, 408 [1955]; *Rifkind v Web IV Music, Inc.,* 67 Misc 2d 26 * * *) and the plaintiff worked for three and a half months during 1975 before resigning, the Court concludes that the agreement between the parties respecting vacation was exe-

cuted by plaintiff's service to the extent that he is entitled to a pro rata portion of the three weeks annual vacation."

The court, in considering the cause of action for vacation pay, discussed "the so-called faithless servant doctrine enunciated in *Lamdin v. Broadway Surface Advertising Corp.,* 272 N.Y. 133 (1936) and subsequent cases" and concluded: "In the instant case, plaintiff's conduct, although highly questionable at best, did not constitute 'disloyalty' to the employer as defined in the cases discussed above. Plaintiff did not fail '* * * to disclose any interest which would naturally influence his conduct in dealing with the subject of his employment' * * * nor did he compete with or steal from Century. Inasmuch as the faithless servant doctrine visits a penalty upon an employee and must be construed strictly * * * the distinctions between the plaintiff's conduct and the type of disloyalty involved in the previously cited cases are sufficient to bar the doctrine's application here. Accordingly, plaintiff is awarded judgment in the second cause of action in the amount of $269.23 [which is the pro rata portion of the three weeks annual vacation]."

### THE APPLICABLE LAW

█ I do not agree with the Trial Term's interpretation of paragraph 7.04 of the pension agreement to the effect that the determination of dishonesty or willful act "to the injury of the Employer or his fellow Employees" could be made only by the board of directors. That paragraph does not state that it is the board of directors that must be the instrumentality of the termination of employment based on its own investigation and consideration of the facts. It merely states that if the board of directors *does* terminate the participant's employment for "dishonesty or * * * willful act in the course of his employment, to the injury of the Employer or his fellow Employees", such determination insofar as forfeiture of pension rights is concerned, shall be "final and binding and conclusive."

A corporation's discharge of its employee is ordinarily handled by its administrative officers (here the president and vice-president) and does not necessarily call for action by the board of directors (see 12 NY Jur, Corporations, § 629). If there were no pension agreement, plaintiff's discharge for alleged dishonesty could be consummated by the president and vice-president, as the bank's chief administrative officers. The pension agreement did not take that power away from those officers. It

merely provided that where the termination of employment was for dishonesty or harmful or willful acts, then (as to "the Policy on his life"), the act of the board of directors "shall be final and binding and conclusive."

Assuming that plaintiff's resignation, together with his unsuccessful attempted withdrawal thereof, constituted a discharge from his employment (as is implicitly agreed to by the parties in their briefs), he had a right under paragraph 7.04 to have the decision reviewed by the board of directors if he desired to preserve his otherwise-vested interest in the pension plan. He never requested such review. He cannot now use the provisions of the pension agreement as a shield against the consequences of his own dishonesty, if he was in fact dishonest. In short, *under New York State law,* if plaintiff was properly discharged for dishonesty, his pension benefits would be forfeited (see *Hadden v Consolidated Edision Co. of N. Y.,* 34 NY2d 88).

Having concluded (erroneously we believe) that the procedure involving plaintiff's termination of employment was improper, the Trial Justice never passed on the factual question of whether plaintiff's conduct, resulting in his resignation, justified the consequent loss of his otherwise-vested pension interests. Since, as stated, the methodology of the discharge is not the determinative factor, it is necessary to analyze the conduct of which plaintiff was accused to attempt to determine whether by reason of dishonesty or willful act he caused injury to his employer or fellow employees. In such review, we will also consider whether the denial of plaintiff's vacation benefits was proper.

The claims of dishonesty and willful injurious conduct were based on three sets of transactions, which are discussed seriatim.

### 1. The Baldwin Liquidators Check

On August 5, 1974 plaintiff made a deposit into the savings account he maintained in the Century branch at Rockaway Park, in the sum of $69,780.45. This was represented by a check of Baldwin Industrial Liquidators, Inc., to the order of Charles Sorkin. This check, as deposited, bore the signature of Charles Sorkin as the only indorsee. (There was no explanation as to how it was credited to plaintiff's savings account without his indorsement.) Plaintiff testified that Mr. Sorkin, who was an attorney and a certified public accountant, had orally authorized him to indorse Mr. Sorkin's name on the

check as an accommodation since he was leaving for Israel before the check could clear and he needed the money (which represented escrow funds) to pay the indebtedness of a certain corporation. Thereafter, plaintiff paid for four bank checks, made out to himself, totaling $69,780.45, cashed them and then turned the proceeds over to Mr. Sorkin's associate, who apparently used the money in the intended manner.

It is not denied that plaintiff received no benefit from this accommodation. However, Mr. Sorkin, who testified at the trial, stated that he had not authorized plaintiff to indorse his name on the Baldwin Liquidators check and that he did not have firsthand knowledge of how it had come into plaintiff's possession. Nevertheless, he made no claim that the proceeds of the check had been improperly distributed. Although the check represented escrow funds, he testified that the beneficiaries of the escrow funds had brought no claim against him and did not intend to do so. He stated he had no intention of suing the bank and that neither he nor anyone involved in the transaction planned to sue plaintiff. To his knowledge all the parties concerned in the transaction considered the matter "closed and disposed of".[1]

## 2. The Borenstein Accounts

On December 31, 1973, Samuel Borenstein appeared at the Rockaway Park branch of the bank with his daughter, Fay Sorkin (who was the sister-in-law of Charles Sorkin). Plaintiff assisted them in opening two accounts: account numbered

---

1. The mystery of the four bank checks may or may not be clarified by the following colloquy at plaintiff's examination before trial:

"Q Now, Mr. Sauer, three of these checks are over $10,000, is that correct?

"A Yes.

"Q Did you report this transaction to the United States Treasury Department?

"A No.

"Q Are you familiar with the regulation that requires transactions of an excess of $10,000 to be reported to the United States Treasury Department?

"A It's a matter of policy, written or not. None of the transactions were ever reported.

"MR. ROTHMAN: No matter what amount?

"Q That is while you were branch manager?

"A While I was branch manager and having discussion with other branch managers, none of this was ever done because we appreciated our customers. We appreciated the transactions of our customers and frequently they would make a deposit or withdrawal in a large amount and it was never done.

"Q You say it was never done by you?

"A To the best of my knowledge it was never done by anyone."

36310 in the name of Samuel Borenstein; and account numbered 36311 in the names of Samuel Borenstein and Fay Sorkin. Both of them were savings accounts bearing interest from day of deposit to day of withdrawal.

Fay Sorkin (appearing as a witness for Century) testified that her father had decided to buy municipal bearer bonds, and that "since he had his money in · * * * different banks, that to expedite matters it should be consolidated into one bank account" and that Mr. Borenstein at that time authorized the plaintiff "to get all the money from the different bank accounts and put it into one bank account, in the bank." Plaintiff was told that the broker who was to purchase the bearer bonds for Mr. Borenstein was L.F. Rothchild & Co.

Plaintiff apparently collected the proceeds of the different bank accounts, some $150,000, and deposited them into Mr. Borenstein's individual savings account. The trial exhibits include a withdrawal slip for this account, signed by Mr. Borenstein and dated January 28, 1974, which reflects a check in the sum of $148,416.56 to L.F. Rothchild & Co. and a transfer of the balance in the account, $1,541.50, to the joint account of Samuel Borenstein and Fay Sorkin (36311).

These two transfers constituted a closing of the Samuel Borenstein account. The transfer of $1,541.50 to the joint account carried along with it the interest that had accrued on the sums received from Mr. Borenstein's previous accounts up to the date of the closing of the Borenstein account in Century.

In March, 1974 Fay Sorkin appeared at the bank and spoke to plaintiff. She told him that she wished to close the joint account and she instructed him how various checks were to be drawn. The joint account was in the sum of approximately $20,000 and various checks totaling $9,500 were made out to herself, her two sisters and a niece and nephew. The bank records also indicate that $10,700 from this joint account was withdrawn as a check to Mr. Borenstein.

This left a balance of $91.50 in the joint account. Fay Sorkin testified that she did not know what happened to that sum. She further testified that she had not known that $50 of that $91.50 was transferred to *plaintiff's* savings account and that as a result of the transfer interest in the sum of $750.98, that had been earned on the two accounts, was also transferred to plaintiff.

Plaintiff testified that when he received the bearer bonds

from the broker he called Fay Sorkin; that she appeared at the bank without her father; and that he turned the bearer bonds over to her. He further testified that thereafter she came to the bank with a signed withdrawal slip to close out the joint account, with instructions as to the checks, and with the balance to be given to her in cash. He testified:

"I told her, at that point, that the dividends to the account would be credited and she immediately told me to stop. That under no circumstances did she want any dividends to be credited to that account.

"I informed her that the dividends would have to be credited to somebody's account, that they just couldn't disappear."

He further testified:

"[T]he interest was just transferred, in total, from one account to the other. And that is how the dividends—I told her—could be given to anybody. If she wanted to open another account in her name or a relative or whatever, that she could transfer these funds to whomever's account she wanted; but that the dividends had to be paid to somebody. They just couldn't disappear.

"And she said, under no circumstances did she want to receive dividends on these accounts. * * *

"[S]he said, 'Well, put it into your account. You have helped me very much and I'd appreciate your services. I don't want the dividends. I cannot, for any reason, have dividends in my name or my father's name on this transaction.'

"I said, 'It requires a transfer. It's a mechanical function through the computer, it requires a transfer of $50, the remaining balance, to be put into a recipient's account, whose ever account it may be.' * * *

"All that was required, in order to transfer dividends from one account to another account upon the closing of the first account is a $50 transaction. So, she took the $41 and change and transferred the $50 balance to my account so that the dividend would be credited to my account and not hers."[2]

---

2. The mystery of the Borenstein accounts and the bearer bonds may or may not be clarified by the following colloquy:

"THE COURT [to plaintiff's counsel] * * * I take it, your intention is that there was some kind of scheme here for the purpose of which we don't know; but it may have been involved with tax avoidance?

"MR. ROTHMAN [plaintiff's counsel]: Yes.

"THE COURT [to Fay Sorkin] * * * Is there somebody, a lawyer, presumably or an accountant, working on your father's property that he left when he died?

### 3. Plaintiff's Own Bank Account

From time to time plaintiff withdrew money from his own account in the Rockaway Park branch by the use of bank checks made payable to himself and then indorsed by him for the receipt of cash. There were some 24 bank checks and the total amount was $42,500. Plaintiff testified that the checks constituted turnovers of no more than a total of several thousand dollars, and that they related to "private business reasons which had nothing to do with the bank." He stated: "I used the facilities that any depositor of the bank could use. As a depositor of the bank I was entitled to have an exchange check issued to myself."

Century's brief points to no dishonesty or violation of bank regulations as to the use of such checks by its employees.

#### CONCLUSION

As we have noted Trial Term did not reach or determine the factual issue of whether plaintiff had been dishonest or committed "any willful act in the course of his employment, to the injury of the Employer or his fellow Employees", and though we have the power to do so in this nonjury case (see *Phoenix Mut. Life Ins. Co. v Conway*, 11 NY2d 367), we are unwilling to decide that issue in the first instance on the record before us.

In view of the aura of tax avoidance or evasion with which this record is instinct, we cannot agree with Century's statement in its brief that "[t]he witnesses testifying on behalf of Appellant are not interested witnesses as they have nothing to gain or lose by the outcome of the case at bar" and that we should therefore accept their testimony as true. It is indeed possible that the Borenstein transactions were designed to prevent the Internal Revenue Service from discovering that the Borenstein funds were used for the purchase of bearer bonds. As to the Baldwin Liquidators transactions, there is no evidence that plaintiff received any profit therefrom. As to the use by plaintiff of the banks' facilities to obtain bank checks when withdrawing moneys from his own account appellant has not pointed to any violation of statute, regulation or internal prohibition which would make plaintiff's conduct in

---

"THE WITNESS [Fay Sorkin]: No, not that I know of. He didn't have all that much. I don't know."

that regard dishonest or "to the injury of the Employer or his fellow Employees".

■ Although not briefed by the parties it should be noted that upon the retrial here directed, if the trial court decides that plaintiff's actions were such as would under previous State law constitute a forfeiture of his pension rights, it must take into consideration (1) that under the Employees Retirement Income Security Act of 1974 (ERISA) the dishonesty of an employee does not constitute a forfeiture of pension benefits as to a computable percentage thereof (in this case 90%) (see US Code, tit 29, § 1053, subd [a], par [2]); (2) that the vesting provisions of ERISA do not bind a particular pension plan until the beginning of the first plan year after December 31, 1975 (see US Code, tit 29, § 1061, subd [b], par [1]), so that the vesting provisions of ERISA had not become effective as of the date of plaintiff's discharge in April, 1975; and (3) that ERISA provides that it pre-empts State law concerning pension benefit plans *effective January 1, 1975* (see US Code, tit 29, § 1144). Therefore, as of January 1, 1975, there was no State law governing the question of when an employee forfeits accrued pension benefits, and the Federal vesting provisions were not to become applicable until sometime after January 1, 1976, depending upon when the specific plan year began. If Trial Term finds that plaintiff's acts constituted dishonesty or willful injurious acts, it will then necessarily have to determine the question of what law governs pension forfeitures which occurred in the period from January 1, 1975 to January 1, 1976 (see *Amory v Boyden Assoc.,* 434 F Supp 671; *Riley v MEBA Pension Trust,* 570 F2d 406; Lee, ERISA's "Bad Boy": Forfeiture For Cause in Retirement Plans, 9 Loyala U LJ 173).

Upon the retrial hereby directed the trial court, in passing on the facts (which should be developed in greater detail than they were on the earlier trial), should consider anew whether plaintiff was a "faithless servant" under the doctrine set forth in *Lamdin v Surface Adv. Corp.* (272 NY 133, *supra)* on the issue of his right to pro rata vacation pay.

Under the circumstances, the judgment appealed from should be reversed and a new trial granted, with costs to abide the event.

MOLLEN, P. J., HOPKINS and MARTUSCELLO, JJ., concur.

Judgment of the Supreme Court, Nassau County, entered

May 9, 1978, reversed, on the law, and new trial granted, with costs to abide the event.